1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARIA G. HERRERA,**<br><br>          **Plaintiff,**<br><br>     **v.**<br>**THOMAS GIAMPIETRO,et al.,**<br><br><br>          **Defendants.** | **1:09-cv-01466-OWW-SKO**<br><br>**MEMORANDUM DECISION ON DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE FIRST AMENDED COMPLAINT (Doc. 18)** |

## I.   INTRODUCTION

On August 19, 2009, Maria G. Herrera ("Plaintiff") filed this action for damages and injunctive relief against Defendants Thomas Giampetro ("Giampetro"), Rosemary Montemayor ("Montemayor"), and the Monso-Sultana Joint Union Elementary School District ("District"). (Doc. 1, Original Complaint).  Plaintiff filed a First Amended Complaint ("FAC") on December 30, 2009.  (Doc. 16).

Before the court is Defendants' motion to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc 18). Plaintiff filed opposition ("Opposition") to Defendants' motion to dismiss on March 1, 2010.  (Doc. 20).  Defendants filed a reply ("Reply") to Plaintiff's opposition on March 8, 2010. (Doc. 22). ///
///

**1**

## II.  **FACTUAL BACKGROUND**

In August 2003, Plaintiff enrolled her son E.G. in kindergarten at Monson-Sultana Elementary School ("Elementary School").  (FAC at 3).  A few days after E.G. commenced kindergarten, E.G.'s teacher, Michelle Banda ("Banda"), and another employee of the District, Melissa Valdez ("Valdez"), began trying to convince Plaintiff to withdraw E.G. from the Elementary School and to enroll him the following year.  (FAC at 3).  Banda and Valdez told Plaintiff that E.G. was immature, had difficulty holding a pencil and writing his name, and required more attention than Banda could provide given the number of children in her class. (FAC at 3).  Plaintiff volunteered to help in the classroom, and was permitted to do so for a few days.  (FAC at 4).

Sometime after Plaintiff began volunteering in E.G.'s classroom, Banda reiterated her belief to Plaintiff that she should withdraw E.G. from the class. (FAC at 4).  Plaintiff met with Giampietro– the District's Superintendent and the Elementary School's Principal– and Giampietro told Plaintiff he agreed with Banda and Valdez that it would be better for E.G. to stay home for one more year before returning to kindergarten.  (FAC at 4). Plaintiff reluctantly withdrew E.G. from the Elementary School. (FAC at 4).

Plaintiff re-enrolled E.G. at the Elementary School in August 2004. (FAC at 4).  Because Plaintiff began to suspect that E.G. might have autism, she met with Giampietro and told him E.G. needed help.  (FAC at 4).  Giampietro failed to act on Plaintiff's request.  (FAC at 4).

///

**2**

On or about September 2005, with the assistance of E.G.'s first-grade teacher, Plaintiff approached Giampietro about obtaining a special education assessment for E.G. (FAC at 4). Gaimpietro referred Plaintiff to Victor Carillo ("Carillo"), the District's school pyschologist at the time. (FAC at 4). Carillo failed to act promptly. (FAC at 4). Plaintiff met with Carillo repeatedly and requested that he set up an assessment for E.G. (FAC at 5). On or about February 22, 2006, approximately six months after Plaintiff first requested assistance from Carillo, Carillo presented Plaintiff with a plan to assess E.G.'s eligibility for special education services. (FAC at 4). Plaintiff signed the assessment plan the same day she received it. (FAC at 4).

Carillo completed his assessment of E.G. on or about March 7, 2006. (FAC at 4). Carillo's assessment supported the conclusion that E.G. was eligible for special education services. (FAC at 5). Although federal and California law each provide that an Individualized Educational Plan ("IEP") team meeting should be convened within sixty days of a parent's signing of an assessment plan, an IEP team meeting for E.G. was not convened until May 19, 2009. (FAC at 6).

The IEP team found that E.G. was eligible for special education services based on a disability of autism, and an IEP was created for E.G. which called for him to be included in a regular education classroom while receiving certain accommodations. (FAC at 5). The accommodations called for in E.G.'s IEP took the form of a series of "Tips for working with [E.G.]." (FAC at 5). E.G.'s IEP called for accommodations such as allowing him to take breaks

during the day to stay regulated and to return to the classroom once he calmed down. (FAC at 5). Plaintiff signed the IEP on the same day she received it. (FAC at 5). Due to the Defendants' delays, E.G. did not receive any special education services while in the first grade. (FAC at 5).

E.G. commenced second grade at the Elementary School during the 2006-2007 school year. (FAC at 5). School personnel regularly failed to comply with E.G.'s IEP, causing E.G. to grow agitated and create classroom disruptions. (FAC at 5). The District imposed detentions and suspensions on E.G. in response to his disruptive actions, prompting Plaintiff to call multiple IEP team meetings to request compliance with E.G.'s IEP. (FAC at 5). Plaintiff also requested modification of E.G.'s IEP. (FAC at 5). On or about January 2007, a District employee told Petitioner that during a conversation with Montemayor, Montemayor said "Mr. [Giampietro] is going to have a hard time with [Plaintiff] because [she] is not stupid." (FAC at 6).

On or about February 13, 2007, Plaintiff filed a compliance complaint against the district with the California Department of Education ("CDE"). (FAC at 6). On April 13, 2007, the CDE found that the District had failed to timely develop an IEP plan for E.G. and failed to implement the IEP. (FAC at 6).

Sometime in February 2007, E.G.'s IEP team developed a new IEP for him which included a Positive Behavioral Intervention Plan ("PBIP"). (FAC at 6). A PBIP is a plan that is developed when a student exhibits a serious behavior problem that significantly interferes with the implementation of the goals of his IEP. (FAC at 6). A PBIP includes an objective and measurable description of the

**4**

targeted maladaptive behavior and replacement positive behavior. (FAC at 6). It also includes a detailed description of the behavioral interventions to be used and the circumstances for their use. FAC at 6. Plaintiff signed the IEP & PBIP on March 6, 2007. (FAC at 6). E.G.'s PBIP provided in relevant part as follows: "Verbally de-escalate [E.G.]. Do not make physical contact with him, because it will only result in escalation. In an absolute crisis situation when [E.G.] or someone else is in immediate danger then make physical contact as limited as possible. Ex. Grasp his hands and state the expectation for you to release. Abide by what you state. Include having him demonstrate self control via speech and/or breathing before you release." (FAC at 6-7).

On March 13 and again on March 20, 2007, incidents occurred in which District personnel failed to follow E.G.'s IEP and PBIP in response to E.G.'s disruptive behavior. (FAC at 7). During the March 20 incident, E.G. climbed onto a counter with a pair of scissors and ultimately had to be restrained by adults. (FAC at 7). When E.G. became agitated during class On March 21, 2007, District personnel failed to adhere to E.G.'s IEP and PBIP once again, causing E.G. to become so upset that he engaged in a violent outburst. (FAC at 7). E.G. swung a yard stick, overturned a desk, and threw chairs and desks in the classroom. (FAC at 7). Two adults in the classroom who were untrained in emergency behavioral interventions "prone contained" E.G. by forcibly restraining him on the floor. (FAC at 7). Prone containment is a dangerous intervention that risks asphyxiating the person subjected to it, and applicable guidelines prohibit untrained persons from employing prone containment. (FAC at 7). District personnel called the

**5**

county sheriff's department in connection with the incident and suspended E.G. for three days.  (FAC at 7).

Plaintiff did not return E.G. to the Elementary School as a full-time student for the remainder of the academic year because she feared for E.G.'s safety.  (FAC at 7).  Instead, at an IEP meeting on April 17, 2007, the IEP team agreed that E.G. would undergo independent study at home for the remainder of the year. (FAC at 7).  Plaintiff requested that E.G. receive services at his grandmother's home on days when Plaintiff was working.  (FAC at 7). E.G.'s grandmother, Maria Barragan ("Barragan"), lives in the town of Cutler, which is in a different school district than the Elementary School.  (FAC at 7).  The District arranged for the Cutler-Orosi Joint Unified School District to provide E.G. with certain educational services.  (FAC at 7).  E.G. received approximately one hour of home instruction per day for the remainder of the school year. (FAC at 8).  Some services were provided by the District at Plaintiff's home in Sultana, other services were provided by the Cutler-Orosi District at Barragan's home in Cutler.  (FAC at 8).

On or about January 2007, Plaintiff assisted Adriana Alvarez ("Alvarez") by acting as a translator during a meeting with Giampietro and Carillo in which Alvarez requested a special education assessment for Alvarez's niece, A.R.A.  (FAC at 10). Giampietro and Carillo refused to assess A.R.A. on the grounds that Alvarez was not A.R.A's parent and therefore had no right to request an assessment.  (FAC at 10).  In fact, as A.R.A.'s legal guardian, Alvarez was lawfully entitled to refer A.R.A. for a special education assessment.  (FAC at 10).  On or about February

**6**

15, 2007, with Plaintiff's help, Alvarez filed a compliance complaint with the CDE. (FAC at 10). The CDE determined that the District was out of compliance for failing to initiate a special education assessment for A.R.A. (FAC at 10-11). Ultimately, A.R.A was assessed and found eligible for special education services on account of mental retardation and language impairment. (FAC at 11).

E.G. returned to the Elementary School for the 2007-2008 school year as a full-time student in the third grade. (FAC at 8). On September 17, 2007, another incident occurred in which E.G.'s autistic behaviors disrupted the classroom, and District personnel failed to follow the procedures required by E.G.'s IEP and PBIP. (FAC at 8). Barragan picked E.G. up from school and noticed scratches and bruises on E.G.'s body. (FAC at 8). The District suspended E.G. from school. (FAC at 8). Plaintiff and the District agreed to amend the IEP so that E.G. would no longer be a full-time student. (FAC at 8). The amended IEP provided for one hour of on-campus instruction per week and one weekly session with the school psychologist. (FAC at 8).

In mid-November 2007, Plaintiff attempted to enroll E.G. in a day care program in Sultana. (FAC at 8). A few days after Plaintiff's initial contact with the day care's operator, the operator called Plaintiff to inform her that she would not accept E.G. because District employees had told the operator how "terrible" E.G. was. (FAC at 8). In February 2008, Plaintiff enrolled E.G, in an on-line charter school for the remainder of the academic year. (FAC at 8).

///

1    Plaintiff filed a second compliance complaint against the
2  district with the CDE on February 28, 2008, alleging numerous
3  violations of state and federal law during the period from March 6,
4  2007 through September 18, 2007. (FAC at 8). On April 16, 2008,
5  in response to Plaintiff's second CDE Complaint, investigators
6  interviewed at least five District employees including Giampietro;
7  the Elementary School's Vice-Principal, Bill Fulmer; E.G.'s former
8  third-grade teacher, Denise Bese; the school nurse, Shannon Coats;
9  and E.G.'s former classroom aide, Eren Ortiz.  (FAC at 9).
10 Plaintiff alleges that there is "likely...evidentiary support" for
11 the notion that Montemayor was aware of the investigation and that
12 it was prompted by Plaintiff's CDE complaint. (FAC at 9).  After
13 completing its investigation, the CDE charged the District with
14 seven violations of law and awarded E.G. 36 days of compensatory
15 education. (FAC at 9).  At an IEP meeting on June 27, 2008, the
16 IEP team agreed that the CDE-ordered compensatory education would
17 be satisfied through 180 hours of tutoring services at a cost of
18 sixty dollars per hour. (FAC at 9).

19     On or about August 11, 2008, in response to a request by the
20 District, the Housing Authority of Tulare County ("Housing
21 Authority") sent the District a list of the names and addresses of
22 Housing Authority tenants residing within District boundaries.
23 (FAC at 11).  Absent from this list were Barragan and her adopted
24 son, D.H. (FAC at 13).  D.H. is Plaintiff's nephew and is also
25 Barragan's grandson, and Montemayor was aware of the close family
26 relationship between Plaintiff, Plaintiff's children, Ms. Barragan,
27 and D.H.  (FAC at 11-12).  D.H. had attended the Elementary School
28 since the 2006-2007 school year.  (FAC at 12). Although he lived

**8**

1  outside of the District, D.H. was able to enroll at the Elementary
2  School because Barragan falsely used Plaintiff's address in D.H.'s
3  enrollment documents.  (FAC at 12-13).  However, the District had
4  reason to know that D.H. did not in fact live at Plaintiff's
5  address, because among other indicators known to the District,
6  D.H.'s address on all documents submitted to the District in
7  support of his enrollment in the free school lunch program showed
8  Ms. Barragan's home address in Cutler.  (FAC at 12).

9     On August 22, 2008, Montemayor called Barragan and asked her
10  to come to the Elementary School for a meeting with Giampietro.
11  (FAC at 11).  Barragan, who speaks only Spanish, met with
12  Giampietro on August 22, 2008.  (FAC at 13).  Montemayor acted as
13  a translator for Barragan. (FAC at 13). Giampietro asked Barragan
14  if she lived with Plaintiff in Sultana.  (FAC at 13).  Fearful that
15  D.H. might lose his place in the District and at the Elementary
16  School, Ms. Barragan stated falsely that she lived with Plaintiff
17  from Monday to Friday each week.  (FAC at 13).  Giampietro then
18  stated that he could have Plaintiff kicked out of her house because
19  it was illegal for Barragan to live with Plaintiff.  (FAC at 13).
20  Barragan, concerned for Plaintiff, explained that, in fact, she did
21  not live with Plaintiff but simply took care of Plaintiff's
22  children at Plainitff's home from time to time.  (FAC at 13). At
23  the conclusion of the August 22 meeting, Giampietro mandated that
24  Barragan take D.H. out of the Elementary school and enroll him in
25  the Cutler-Orosi District.  (FAC at 17).  Plaintiff alleges that
26  she experienced guilt, hardship, anxiety, and severe mental and
27  emotional anguish over the difficulties D.H. encountered as a
28  result of is forced transfer from the Elementary school. (FAC at

**9**

17).

Sometime after meeting with Barragan, Giampetro wrote a letter to the housing authority alleging that Barragan had told him that she was paying $200 per month to Plaintiff as rent in order to live in Plaintiff's residence. (FAC at 13-14). D.H.'s school record was attached to the Giampietro's letter. (FAC at 14).[1]  A few days after Giampietro sent his letter to the Housing Authority, a Housing Authority agent served Plaintiff with an eviction notice which stated: "You have violated the terms of your lease by subleasing the home to your relative, Maria Barragan and grandson [D.H.]." (FAC at 15; Ex. B).  The eviction notice and Petitioner's subsequent efforts to avoid eviction caused Plaintiff to suffer mental anguish and embarrassment in front of co-workers and neighbors. (FAC at 15-16). Ultimately, Plaintiff retained her eligibility for public housing. (FAC at 16).

For most of the 2008-2009 school year, E.G. was enrolled in the Cutler-Orosi District. (FAC at 16).  At E.G.'s IEP meeting on or about Novermber 2008, an employee of the Cutler-Orosi District told Plaintiff that the District had recommended to a number of parents of disabled students that they transfer to Cutler-Orosi rather than remain in the District. (FAC at 16-17).

---

[1] It appears that the FAC contains typographical errors regarding the dates of certain events.  Some of the dates provided in the FAC indicate that actions regarding the Housing Authority occurred in 2009 rather than in 2008. For example, the FAC alleges that a secretary from the District called the housing authority on August 22, 2009; that Barragan called Plaintiff to discuss her meeting with Gaimpietro on the night of August 22, 2009; that Plaintiff called the Housing Authority to discuss Giampietro's allegations on August 25, 2009; and that Plaintiff was served with an eviction notice on August 26, 2009.  (FAC at 14-15).  Defendants have not objected to the ambiguity caused by these errors, and the documentary evidence indicates that the events in question occurred in 2008.  *(See* FAC, Exs. A and B).

1

### III.  LEGAL STANDARD

2    Dismissal under Rule 12(b)(6) is appropriate where the
3 complaint lacks sufficient facts to support a cognizable legal
4 theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th
5 Cir.1990). To sufficiently state a claim to relief and survive a
6 12(b)(6) motion, the pleading "does not need detailed factual
7 allegations" but the "[f]actual allegations must be enough to raise
8 a right to relief above the speculative level." *Bell Atl. Corp. v.*
9 *Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
10 Mere "labels and conclusions" or a "formulaic recitation of the
11 elements of a cause of action will not do." *Id*. Rather, there must
12 be "enough facts to state a claim to relief that is plausible on its
13 face." *Id*. at 570. In other words, the "complaint must contain
14 sufficient factual matter, accepted as true, to state a claim to
15 relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S.
16 ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal
17 quotation marks omitted).

18    The Ninth Circuit has summarized the governing standard, in
19 light of *Twombly* and *Iqbal*, as follows: "In sum, for a complaint to
20 survive a motion to dismiss, the nonconclusory factual content, and
21 reasonable inferences from that content, must be plausibly
22 suggestive of a claim entitling the plaintiff to relief." *Moss v.*
23 *U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir.2009) (internal
24 quotation marks omitted). Apart from factual insufficiency, a
25 complaint is also subject to dismissal under Rule 12(b)(6) where it
26 lacks a cognizable legal theory, *Balistreri*, 901 F.2d at 699, or
27 where the allegations on their face "show that relief is barred" for
28 some legal reason, *Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910,

**11**

1  166 L.Ed.2d 798 (2007).

2    In deciding whether to grant a motion to dismiss, the court

3  must accept as true all "well-pleaded factual allegations" in the

4  pleading under attack. *Iqbal*, 129 S.Ct. at 1950. A court is not,

5  however, "required to accept as true allegations that are merely

6  conclusory, unwarranted deductions of fact, or unreasonable

7  inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988

8  (9th Cir.2001). "When ruling on a Rule 12(b)(6) motion to dismiss,

9  if a district court considers evidence outside the pleadings, it

10  must normally convert the 12(b)(6) motion into a Rule 56 motion for

11  summary judgment, and it must give the nonmoving party an

12  opportunity to respond." *United States v. Ritchie*, 342 F.3d 903,

13  907 (9th Cir.2003). "A court may, however, consider certain

14  materials-documents attached to the complaint, documents

15  incorporated by reference in the complaint, or matters of judicial

16  notice-without converting the motion to dismiss into a motion for

17  summary judgment." *Id.* at 908.

18  **IV.  DISCUSSION**

19  **A. Plaintiff's Claim Pursuant to 42 U.S.C. § 1985(3)**

20    Defendants contend that Plaintiff has failed to plead facts

21  sufficient to state a claim for relief under 42 U.S.C. § 1985(3).

22  Section 1985(3) provides in relevant part:

23    If two or more persons . . . conspire . . . for the
    purpose of depriving, either directly or indirectly, any
24    person or class of persons of the equal protection of the
    laws, or of equal privileges and immunities under the
25    laws . . . the party so . . . deprived may have an action
    for the recovery of damages occasioned by such . . .
26    deprivation, against any one or more of the conspirators.

27  42 U.S.C. § 1985(3)(2009).  In order to assert a claim for relief

28  under section 1985(3), a plaintiff must allege: (1) a conspiracy;

**12**

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *E.g. Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (citing *United Brotherhood of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 828-29 (1983).

Defendants argue that Plaintiff has failed to plead the conspiracy element of a section 1985(3) claim because the facts alleged by Plaintiff do not "support a facially plausible inference that Mrs. Montemayor entered into an agreement, made a mutual decision or had a mutual understanding with Mr. Giampietro for the purpose of depriving Plaintiff of her civil rights." Motion to Dismiss at 7. A claim under § 1985 requires allegations of fact which support the notion that two or more individuals conspired together. *E.g. Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988). A plaintiff may satisfy her pleading burden with respect to section 1985(3) by pleading facts from which the existence of a conspiracy may be inferred. *See Scott v. Ross*, 140 F.3d 1275, 1284 (9th Cir. 1998)(discussing burden of proof for establishing entitlement to relief under section 1985(3)). The requirement that a plaintiff plead facts sufficient to create plausible grounds to infer an agreement simply requires a plaintiff to allege enough facts to raise a reasonable expectation that discovery will reveal evidence of a conspiracy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).

**13**

Plaintiff alleges that Giampietro conspired, with at least one other employee of the District, to retaliate against Plaintiff for filing compliance complaints with the CDE. According to the FAC, Giampietro and at least one other individual agreed to report to the Housing Authority that Plaintiff was violating the terms of her lease agreement for Section 8 housing, which in turn lead the Housing Authority to take steps to evict Plaintiff. The FAC also alleges that Giampietro and at least one other individual conspired to force Plaintiff's nephew, D.H., out of the District in order to inflict emotional distress on Plaintiff. Plaintiff has failed to plead sufficient facts to permit a reasonable inference that any other person conspired with Giampietro to retaliate against Plaintiff.

The FAC contains the following factual allegations concerning Giampietro's alleged coconspirator:

31. On or about January 2007, a District employee recounted to Plaintiff a discussion that she had had with Defendant Montemayor, in which Montemayor said, "Mr. G [i.e., Giampietro] is going to have a hard time with her [i.e., Plaintiff] because this one is not stupid." (FAC at 6).

48. On April 16, 2008, in response to the Second CDE Complaint, two CDE investigators visited Tulare County to interview Plaintiff's attorney, as well as SELPA and District personnel. The investigators interviewed at least five District employees, including Giampietro; the Elementary School's Vice-Principal, Bill Fulmer; E.G.'s former third-grade teacher, Denise Bese; the school nurse, Shannon Coats; and E.G.'s former classroom aide, Eren Ortiz. The following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery: Defendant Montemayor was aware of the nature of these interviews and that they were prompted by the Second CDE Complaint. (FAC at 9).

62. On or about August 22, 2008, Ms. Barragan (Plaintiff's mother-in-law and E.G.'s grandmother) received a call from Defendant Montemayor, an

**14**

Administrative Assistant with the District. Montemayor asked Ms. Barragan to come to the Elementary School that day for a meeting with Giampietro. (FAC at 11).

64. Montemayor was well aware of the close family relationship between Plaintiff, Plaintiff's children, Ms. Barragan, and D.H. (FAC at 11).

67. On August 22, Ms. Barragan met with Giampietro at the Elementary School. At the meeting, Giampietro spoke English and Montemayor translated for Ms. Barragan, who speaks only Spanish. Giampietro asked Ms. Barragan if she lived with Plaintiff in Sultana, California. (FAC at 13).

73. The following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery: Montemayor or another District employee was the individual who "brought to [Giampietro's] attention that some people that are not on the approved families listing are living at 41796#C Rd. 105 in Sultana." (FAC at 14).

75. In addition, according to the Housing Authority, on or about August 22, 2009, a District secretary telephoned the Housing Authority to identify D.H. as a student enrolled in the District who claimed to reside in a Housing Authority unit, but whose name did not appear on the list of Housing Authority tenants living within the District. When it provided this information to Plaintiff, the Housing Authority could not or would not identify the secretary. The following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery: the secretary was Montemayor. (FAC at 15).

Assuming that either Montemayor or an unknown District employee was the individual who (1) brought to Giampietro's attention D.H.'s enrollment issue; and (2) later called the the Housing Authority to identify D.H. as a student who claimed to reside in Plaintiff's Housing Authority unit, such actions demonstrate nothing more than the exercise of official duties to ascertain the true residence of a student. With respect to Montemayor's phone call to Barragan and her role as translator during the meeting between Giampietro and Barragan, such actions appear to reflect Montemayor following the lawful directives of her superior. Without more, including

allegations of animus borne of intent to deprive or interfere with E.G.'s right to a free public education, allegations that a District employee acted in the course and scope of her employment do not support an inference of conspiracy to commit an unlawful act or acts. *See, e.g., Barstad v. Murray County*, 420 F.3d 880, 887 (8th Cir. 2005)("Because the Barstads pleaded only that Onken 'acted in the course and scope of [her] employment,' they fail to demonstrate the existence of a conspiracy"); *accord Rabkin v. Dean*, 856 F. Supp. 543, 551-52 (N.D. Cal 1994) (section 1985 claim unavailable where the conspiratorial conduct challenged is "essentially a single act by a single governmental body acting exclusively through its own officers, each acting within the scope of his or her official capacity"); *Rivers v. County of Marin*, 2010 U.S. Dist. LEXIS 1419* 20-23 (N.D. Cal 2010) (section 1985 claim against government agent for acts performed in official capacity available only where defendant acted outside the scope of her official duty for personal gain).

The FAC does not allege that Montemayor acted outside the scope of her duties.  Unlike the allegations concerning Giampietro, the FAC does not allege that she made any knowingly false statements; nor does the FAC allege facts which support an inference that Montemayor's actions were motivated by an improper purpose.  The FAC is insufficient to support a reasonable inference that Montemayor conspired with Giampietro.  Plaintiff's claim under section 1985(3) must be dismissed with leave to amend.

**B. Plaintiff's Claim under 42 U.S.C. § 1986**

Section 1986 imposes liability on every person who knows of an impending violation of section 1985 but neglects or refuses to

**16**

prevent the violation. *Karim-Panahi*, 839 F.2d at 626. There is a predicate to a section 1986 claim: "A claim can be stated under section 1986 only if the complaint contains a valid claim under section 1985." *Id.* (citing *Trerice v. Pedersen*, 769 F.2d 1398, 1403 (9th Cir. 1985)). Because Plaintiff's conspiracy claim must be dismissed, Plaintiff's section 1986 claim is derivative and must be dismissed as well. *See id.*

**C. Plaintiff's ADA Retaliation Claim**

Defendants' Motion to Dismiss Plaintiff's ADA claim contends Plaintiff is not entitled to relief. Motion to Dismiss at 8. Plaintiff concedes that she does not have standing to seek the injunctive relief prayed for in the FAC. (Opposition at 12, n.2**)**. Accordingly, Plaintiff's claim is only cognizable if the relevant statutes confer on Plaintiff a right to monetary damages.

Defendant cites *Tannislado Alvardo v. Cajun Operating Co.*, 588 F.3d 1261 (9th Cir. 2009) for the proposition that "the ADA does not provide for compensatory or putative damages in a retaliation case." (Motion to Dismiss at 8). The Ninth Circuit's decision in *Alvarado* concerned the remedies available under 42 U.S.C. § 12117. 588 F.3d at 1264-65.

Plaintiff cites *Barnes v. Gorman*, 536 U.S. 181 (2002) for the proposition that compensatory damages are available against public entities pursuant to Title VI of the Civil Rights Act of 1964. (Opposition at 12). Plaintiff distinguishes *Alvarado* on the basis that the rule espoused therein applies to suits against private entities, not public entities such as the District. (Opposition at 11-12). Plaintiff's distinction is rooted in the statutory framework which sets forth the remedies for violations of the ADA's

anti-retaliation provision. *See* 42 U.S.C. § 12203(c). Section 12203(c) provides:

> The remedies and procedures available under sections 107, 203, and 308 of this Act [42 USCS §§ 12117, 12133, 12188] shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to title I, title II and title III [42 USCS §§ 12111 et seq., 12131 et seq., 12181 et seq.], respectively.

42 U.S.C. § 12203(c)(2009).

Unlike the claim at issue in *Alvarado*, Plaintiff's claim is directed at a public entity, the District. Section 12133 is the applicable statute affording remedies available against public entities. *See Barnes*, 536 U.S. at 184-85. In *Barnes*, the High Court held that the remedies available pursuant to section 12133 are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, which include monetary damages. *Id*. at 185. Accordingly, Plaintiff may be entitled to monetary damages for her retaliation claim against the district, and therefore Defendants' motion to dismiss Plainitff's ADA cause of action is DENIED.

**D. Plaintiff's Claim Under California Civil Code § 51**

Defendants' sole contention regarding Plaintiff's claim under California Civil Code section 51 is that it must be dismissed due to Plaintiff's failure to state a cognizable claim under the ADA. (Motion to Dismiss at 10). Because Plaintiff has in fact stated a claim under the ADA, Respondent's argument lacks merit. The motion is DENIED.

**E. Plaintiff's Requests for Declaratory and Injunctive Relief**

Defendant asks the Court to strike Plaintiff's claims for injunctive and declaratory relief on the basis that Plaintiff

lacks standing to obtain such relief.  (Motion to Dismiss at 10).
Plaintiff concedes she lacks standing to obtain injunctive and
declaratory relief.  (Opposition at 12, n.2).  Defendants' motion
to strike Plaintiff's claims for injunctive and declaratory
relief is GRANTED.  Fed. R. Civ. P. 12(f).

**F. Motion to Strike Allegations Regarding D.H.'s Forced Transfer**

Defendant contends that Plaintiff's allegations regarding
D.H.'s forced transfer should be stricken from the complaint
because "Giampietro had a justified legal reason for requesting
[D.H.'s] transfer."  (Motion to Dismiss at 11).  Defendant also
contends that Plaintiff "does not have standing to bring claims
based on D.H.'s alleged injuries...her alleged injury is guilt
over D.H.'s alleged difficulties...feeling guilty does not rise
to the level of an actionable injury." (Motion to Dismiss at 11).

The fact that a defendant had a lawful basis for taking
adverse action against a plaintiff does not insulate the
defendant from liability under the ADA if the plaintiff can
establish that the adverse action was motivated, even in part, by
animus based on a plaintiff's request for an accommodation.  *E.g.*
*Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1065 (9th Cir.
2005).  Whether Giampietro's "justified legal reason" for
requesting that D.H. transfer was a mere pretext for retaliatory
action is a question of fact and thus Defendants' purported
justification for Giampietro's actions is not a basis for
dismissal pursuant to Rule 12(b)(6).

Defendants' contention that Plaintiff "lacks standing" to
complain of D.H.'s transfer is misguided.  Plaintiff's claim is
that the adverse action taken against D.H. was intended retaliate

**19**

against Plaintiff.  While conduct must be material to be adverse in the ADA retaliation context, it need not be traumatic.  *Shotz v. City of Plantation*, 344 F.3d 1161 , 1182-83 (11th Cir. 2003).  As the Eleventh Circuit opined in *Shotz*:

> It is important not to make a federal case out of conduct that is de minimis, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint. However, it is equally important that the threshold for what constitutes an adverse action not be elevated artificially, because, to the extent that it is deemed not to rise to the level of an adverse action, it is removed completely from any scrutiny for discrimination

*Id.*  Plaintiff alleges that Defendants took adverse action against D.H. with the intention of causing Plaintiff distress, and D.H.'s transfer did in fact cause Plaintiff to suffer significantly.  Emotional distress is a cognizable category of injury in discrimination cases.  Accordingly, Defendants' motion to strike Plaintiff's claims concerning D.H. is DENIED.

### V.  CONCLUSION

For the reasons stated, IT IS ORDERED:

1) Defendants' motion to dismiss Plaintiff's claim under 42 U.S.C. § 1985(3) is GRANTED, without prejudice;

2) Defendants' motion to dismiss Plaintiff's claim under 42 U.S.C. § 1986 is GRANTED, without prejudice;

3) Defendants' motion to dismiss Plaintiff's claim under 42 U.S.C. § 12203 is DENIED;

4) Defendants' motion to dismiss Plaintiff's claim under California Civil Code § 51 is DENIED;

5) Defendants' motion to strike Plaintiff's request for injunctive and declaratory relief is GRANTED; and

6) Defendants' motion to strike Plaintiff's allegations

**20**

concerning D.H.'s forced transfer is DENIED.

7) Plaintiff shall lodge a formal order consistent with this decision within five (5) days following electronic service of this decision by the clerk.  Plaintiff shall file an amended complaint within fifteen (15) days of the filing of the order.  Defendant shall file a response within fifteen (15) days of receipt of the amended complaint.

IT IS SO ORDERED.

Dated:    **May 10, 2010**                                          _____/s/ Oliver W. Wanger_____
                                                                     UNITED STATES DISTRICT JUDGE

**21**